**SOCIALIST WORKERS PARTY, et al., Plaintiffs,**

v.

**The ATTORNEY GENERAL OF the UNITED STATES, et al., Defendants.**

**No. 73 Civ. 3160.**

United States District Court, S.D. New York.

Aug. 17, 1987.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for plaintiffs.

Peter C. Salerno, Asst. U.S. Atty., New York City, for defendants.

## OPINION

GRIESA, District Judge.

On August 25, 1986 the court handed down an opinion deciding most of the issues raised at the trial of this action. *Socialist Workers Party v. The Attorney General of the United States,* 642 F.Supp. 1357 (S.D.N.Y.1986). However, one matter was left open. This related to plaintiffs' request for injunctive relief in the form of restrictions regarding various documents possessed by the FBI and other federal agencies. The court ruled in principle that plaintiffs were entitled to some relief of this nature, but left the exact scope of the relief to be determined in a further proceeding. *Id.* at 1432. This proceeding has now been completed.

Plaintiffs have requested, among other things, that files on the SWP, YSA and their members in the possession of defend-

ants should be segregated and their contents not disseminated except in response to legal process or Freedom of Information Act requests. *Id.* at 1431. Plaintiffs originally based this request on both the Privacy Act, 5 U.S.C. § 552a, and the general equitable power of the court. The court rejected the claim under the Privacy Act, but held that relief should be granted under the court's equitable power. The court's ruling in this regard was:

> Turning to the claim under the court's general equity power, certain injunctive relief is appropriate. The court has general power to grant an injunction with respect to documents that the Government obtained through clearly illegal activities, and the maintenance of which serves no legitimate purpose for the agency which possesses them. *Paton v. LaPrade,* 524 F.2d 862, 868–69 (3d Cir. 1975); *Chastain v. Kelley,* 510 F.2d 1232, 1236 (D.C.Cir.1975). These cases hold that an aggrieved party may obtain expungement of Government documents illegally obtained or maintained. Plaintiffs in the present case seek a far less drastic remedy—the segregation of the documents and a provision that they cannot be disseminated except in response to legal process or Freedom of Information Act requests.

> In the court's judgment plaintiffs are entitled to this relief. The exact scope of the relief must be determined. But in principle it should cover records obtained illegally or developed from illegally obtained information. A further proceeding will be necessary to identify precisely what documents and records fall not this category.

*Id.* at 1431–32.

Both sides have proposed language for injunctive relief to be included in the final judgment in this action. However, the Government argues at the outset that plaintiffs are not entitled to any injunctive relief whatever. The court rejects this argument.

■ The organizational plaintiffs—the SWP and YSA—have the necessary standing to obtain the kind of injunction described by the court in its August 1986 opinion. The documents to be covered by the injunction were obtained and generated in the course of the FBI's investigation of the SWP and YSA. The SWP and YSA are not merely members of the general public who are attempting to right some generalized wrongdoing.

■ The two categories of documents most prominently discussed by the parties in connection with the proposed injunction are the FBI informant files and the documents obtained by the FBI in the course of surreptitious entries.

The FBI informant activity occurred over a period of at least 35 years, from 1941 to 1976. However, the evidence in this case relates mainly to the period 1960 through 1976. *Id.* at 1377–83. In the August 1986 opinion, it was held that the damage claim regarding the FBI informant activity was time-barred as to the period prior to October 1974. *Id.* at 1409–10. The court then made a finding that the informant activity occurring from October 1974 to October 1976 was a violation of the SWP's First Amendment rights. *Id.* at 1417. For the sake of the injunction question now being dealt with, the court makes the finding that the informant activity for the entire period 1960–1976 was unconstitutional. The basis for this ruling is apparent from the discussion in the August 1986 opinion. By 1960 the FBI had been investigating the SWP for nearly 20 years.

> The FBI had accumulated evidence of a variety of lawful political pursuits by the SWP, but not evidence of sabotage or violence or anything else of that nature.

*Id.* at 1416. As of 1960 the FBI had enough information to know that it had no legitimate basis for infiltrating the SWP and YSA with member informants or gathering confidential information through non-member informants. The finding in the August 1986 opinion regarding the informant activity beginning in October 1974 applies equally to the entire period from 1960 onwards.

> ... the FBI was using informants not to obtain any information necessary for the prosecution of crimes or for the protec-

tion of national security, but to obtain private information about political meetings, demonstrations and other lawful events and their participants.

*Id.* at 1417.

The FBI's surreptitious entries occurred during the years 1958–66. *Id.* at 1393–95. It was held that there was no statute of limitations bar to claims regarding any of these entries. *Id.* at 1407–9. There was a finding that all such entries constituted knowing violations of the Fourth Amendment by the FBI. *Id.* at 1416.

Since the FBI had no legal right to engage in the informant activity during the stated time and no legal right to make the surreptitious entries, it obviously had no right to obtain the information and documents procured through these activities.

■ Where a governmental agency possesses records and documents obtained or generated illegally, the court has the equitable power to vindicate and protect the rights of parties affected. Expungement is one possible tool to accomplish this. Another device is to place restrictions on the use of the materials. *See Chastain v. Kelley*, 510 F.2d 1232, 1235 (D.C.Cir.1975).

The Government contends that there should be no injunctive relief because there is no threat of future unconstitutional use of the illegally obtained information—such as use in a disruption program. But this ignores the fact that *any* use or dissemination of this material would be tainted with illegality because the information is not lawfully in the hands of the Government. The Government can hardly deny the possibility of usage when it has presented affidavits of seven federal agencies—the FBI, Office of Personnel Management, Secret Service, State Department, Immigration and Naturalization Service, Defense Investigative Service and National Security Agency—urging that they need to have access to the information in these documents for various purposes.

In fairness, it should be stated that the Government's main argument is not that there is no occasion for any injunctive relief whatever, but that the restriction contained in such an injunction should have a safety valve. Thus, the Government has proposed a form of injunction which would basically restrict the use of the materials in the way proposed by plaintiffs, subject to the right of the Government to apply to a court for an exception, or to make an emergency exception without court order followed by a report to the court.

For instance, some Government agencies involved in security clearances assert that they would wish to know whether a person seeking a clearance was a member of the SWP or the YSA. They aver that such membership would not be dispositive, but might be a reasonable basis for questioning the person as to whether he should be entrusted with secret data important to the national security. The August 1986 opinion indicated that this type of inquiry would be proper. *Id.* at 1427–28. It is conceivable that a rare situation might arise in which some information covered by the injunction in this action might legitimately be used in connection with such a matter. Such an instance could be presented if an applicant for a security clearance failed to reveal his SWP membership on the application and the materials covered by the injunction showed such membership.

The court rules that plaintiffs are entitled to a restriction on the use of illegally obtained materials, subject to the Government having a reasonable means of obtaining an exception.

This brings us to the terms of the injunction to be entered. The first paragraph proposed by plaintiffs is as follows:

1. No document (including all documentary material and information maintained in any form) in the custody, possession, or control of defendants which was obtained unlawfully or developed from unlawfully obtained information shall be used, released or disclosed in any manner within or outside the Government, and no information contained in or developed from any such document shall be used, released, or disclosed by defendants within or outside the Government for any reason except in response to a court order or in response

to a request under the Freedom of Information Act.

Plaintiffs explain that they have proposed the exception regarding a court order because of the possibility that some aggrieved party might need the records in a suit against the Government. They further explain their suggestion of a Freedom of Information Act exception as related to "needs of scholars and the like." The Government does not have any objection to these provisions. As already noted, the Government wishes to have its own provision for obtaining exceptions. The Government's proposal will be further discussed hereafter.

Plaintiffs propose a definition of unlawfully obtained documents and information. This definition refers to the FBI informant activity and surreptitious entries. It also refers to FBI counterintelligence programs (COINTELPRO's), including the SWP Disruption Program. *See* 642 F.Supp. at 1383–89. Finally, plaintiffs seek to have documents derived from the mail cover requested by the FBI included in the definition. *See id.* at 1426.

The Government proposes a first paragraph which is identical to that of plaintiffs except that it would refer only to the FBI and not all to defendants. Also, the Government's definition of unlawfully obtained documents and information would cover only the FBI informant activity and surreptitious entries, and would not refer to the COINTELPRO's and mail covers.

As to whether the injunction should be limited to the FBI or should include all defendants in general, it is noted that the alleged illegal gathering of documents and information at issue in this case related almost entirely to the FBI. There were some limited claims of this nature against the CIA and the Secret Service, which were briefly discussed in the August 1986 opinion. *Id.* at 1425–27. The relevant findings do not provide a basis for imposing a document restriction on the CIA or Secret Service. Plaintiffs do not argue that they do. What plaintiffs are seeking is an order covering documents and information obtained by the FBI which are in the hands of the FBI or in the hands of other federal agencies to whom the FBI has furnished the materials, or excerpts or summaries of them.

Ten federal agencies have filed affidavits in this proceeding indicating that they have in the past received information from the FBI about the SWP, the YSA and members of these organizations. However, these agencies contend that at least to some extent it will be impossible or extremely difficult to determine whether such information in their hands emanated from illegal activity of the FBI, as distinct from a lawful source. This contention relates to the fact that much of the information gathered by the FBI about the SWP and YSA and their members was obtained through entirely legal means. For one thing, the SWP and YSA have for many years published voluminous materials which can be easily obtained.

As to the identification of what was legally procured and what was not, the FBI informant files for the period after 1960 and the documents gathered during the surreptitious entries are discrete and identifiable bodies of documents. As noted, these were illegally obtained. On the other hand, the FBI has a body of information gathered from public sources which clearly falls into the legal category. The problem of identification exists in that the FBI has over the years prepared certain analyses, summaries, etc. relating to the SWP, the YSA and some of their members, which do not indicate the source of what is set forth. Some of these have been forwarded to other agencies. It is probable that both the FBI and the other agencies have certain materials which cannot be traced to a particular source, at least without great difficulty.

Plaintiffs propose that in situations where it cannot be determined whether the item came from a legal or an illegal source, there should be a presumption that it was obtained illegally. In the court's view such a broad presumption is unwarranted. It would deprive the Government of the use of information properly in its possession. Also, the denial of such a presumption

should not prove to be of any substantial difficulty to plaintiffs for the following reason. Undoubtedly, there was *some* use made by the FBI of the unlawfully obtained materials in analyses and summaries and *some* circulation of such materials to other agencies, but the court believes that the scope of such use and circulation was limited. The reason for this is simply that the unlawfully obtained materials had little or no information of interest regarding national security problems. The court recognizes that to some extent the illegally obtained materials were used for COINTELPRO or disruption operations (*Id.* at 1384–89), but even this usage was very limited and did not go beyond the FBI.

Although the court declines to provide the broad presumption requested by plaintiffs, a limited presumption is in order. The SWP and YSA did not publish membership lists. Such lists could generally be obtained only through the informants. Indeed, one duty of informants was to obtain membership lists or other information about the identity of members. Such information should be presumed to have been unlawfully obtained. A relatively few prominent members have been identified publicly. The FBI is well aware of who these people are. But as to the rank and file members of the various local branches, their identities would not generally be publicly available.

Except for this presumption, the injunction will cover only (1) the informant files, (2) documents obtained in the course of surreptitious entries, and (3) materials reasonably identifiable as having been derived from (1) or (2). It is appropriate to have the injunction apply to all defendants.

The court declines to include COINTELPRO or Disruption Program documents in the definition of unlawfully obtained documents or information. It is obvious that the essence of these operations was something different from information gathering. *Id.* at 1384–89. They involved the creation of disruptive schemes by the FBI, often in the form of "poison pen" communications of one kind or another. These operations have long since been concluded. There is no basis in the evidence at the trial, or in the submissions in the present proceeding, for any finding that the FBI or another federal agency will put these documents to any use whatever in the future. To the extent that the files may include documents or information identifiable as coming from the informant activity or surreptitious entries, such items are covered by the other provisions of the injunction.

Another disputed item is whether documents generated from the mail cover requested by the FBI should be included in the injunction. The mail cover on the SWP only lasted for a short time in 1973. *Id.* at 1426. The record in this case does not justify injunctive relief regarding any mail cover documents.

The remaining question relates to the Government's request for a mechanism to obtain exceptions to the injunction. The Government has proposed a provision allowing for an application *ex parte* to any federal court, and also allowing an exception without court permission in an emergency, provided that the court is notified thereafter.

■ A party who is subject to an injunction generally has the right to move for a modification, including an exception, to the injunction for good cause shown. This right exists even in the absence of a specific provision. It is the belief of this court that defendants have, and should have, this right to apply for an exception to the basic restrictive provisions in this case. However, such an application should be on notice in the normal manner, even though sealed materials might be presented to the court in the course of the proceeding. Also, no reason has been shown for allowing the Government to make an "emergency" departure from the injunction at its own discretion. On the latter point, most of the suggestions about possible use of the information involve loyalty or security clearances, and these are matters which are invariably considered over some appreciable period of time. As to matters such as protection of officials by the Secret Service or other agencies, there is no realistic suggestion of why there would be *any*

need, including an emergency need, for information from the illegally obtained materials. The Secret Service, like the other agencies, should be bound to perform their tasks on the basis of *lawfully* obtained information, and they routinely do just that.

The court does not contemplate that there will be any need for numerous or frequent applications by defendants. The court believes that if defendants limit such applications to legitimate needs, they will be very rare. As far as the evidence now shows, the materials involved contain little or no information bearing on national security, and no information about actual or planned violence against public officials, but rather a mass of information about peaceful political activities and the private lives of individuals. *Id.* at 1377–83.

The proposals of both plaintiffs and defendants for exceptions by court order will be dealt with by a provision in the first paragraph of the injunctive relief for "an order issued by this court, applied for on notice."

The injunction will not require the physical segregation of the materials, and may be implemented by notice placed on the relevant files and documents, and other appropriate measures.

On the basis of the above rulings, the court directs that the following injunctive provisions be included in the final judgment in this action:

1. No document or record (including that contained in a computer or other device) in the custody, possession, or control of defendants which was obtained unlawfully or developed from unlawfully obtained material, and no information contained in or derived from any such document or record, shall be used, released, or disclosed by defendants within or outside the Government, for any reason except in compliance with an order issued by this court, applied for on notice, or in lawful response to a request under the Freedom of Information Act.

2. For the purposes of this order, the term "document ... obtained unlawfully or developed from unlawfully obtained information" means:

(a) any document or information obtained after January 1, 1960 as a result of the use of FBI informants in the course of its investigation of the SWP and YSA;

(b) any document or information obtained as a result of surreptitious entries by the FBI of premises owned or controlled by the SWP or YSA, or premises occupied by SWP or YSA members;

(c) any materials reasonably identifiable as having been derived from (a) or (b).

3. Lists of members of the SWP or YSA, or other materials identifying such member or members, will be presumed to be covered by paragraphs 1 and 2.

The parties should settle a final judgment.

SO ORDERED.